# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### LAFAYETTE DIVISION

| | | |
|---|---|---|
| WILDWOOD INDUSTRIES, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 4:06-CV-00124-PRC |
| | ) | |
| GENUINE MACHINE DESIGN, INC., | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on a Motion for Partial Summary Judgment [DE 33], filed by Defendant/Counter-Plaintiff Genuine Machine Design, Inc. ("GMD") on June 15, 2007, and a Plaintiff's Motion for Summary Judgment on its Claim and on Counterclaim [DE 36], filed by Plaintiff/Counter-Defendant Wildwood Industries, Inc. ("Wildwood") on June 15, 2007.  On July 23, 2007, Wildwood filed a response in opposition to GMD's Motion for Partial Summary Judgment and GMD filed a response in opposition to Wildwood's Motion for Summary Judgment.  On August 7, 2007, GMD and Wildwood filed their respective replies.  For the following reasons, the Court denies the Motions for Summary Judgment.

## PROCEDURAL BACKGROUND

On September 1, 2006, Wildwood filed a Complaint in this Court, alleging that GMD breached a contractual agreement to build a number of custom fabricated manufacturing machines. Wildwood brings its claim before this Court pursuant to 28 U.S.C. § 1332, diversity jurisdiction. On October 17, 2006, GMD filed an Answer to Wildwood's Complaint along with a Counterclaim against Wildwood for breach of contract and repudiation based on Wildwood's alleged failure to

comply with the same contractual agreement.  On June 15, 2007, Wildwood and GMD filed cross Motions for Summary Judgment.  The Motions are now fully briefed and before the Court.

The parties consented to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case.  Thus, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## FACTUAL BACKGROUND

This matter stretches beyond the four corners of the writings that form the underlying agreement; so too does discussion in the fact section below.  The facts are largely settled as a result of a paper trail of contractual writings, negotiations, and communications.  Any disputed facts will be identified by the Court.  The Court notes at the outset that the agreed upon delivery date for the machines is a dispute at the center of this litigation.

Wildwood is a corporation registered to do business in Illinois with manufacturing facilities and its principal place of business in Bloomington, Illinois.  Wildwood manufactures parts, including heating, ventilation, and air conditioning ("HVAC") filters.  Gary Wilder ("Wilder") is the president of Wildwood, and Dominic Propersi ("Propersi") is the operations manager.  Both men have more than a decade of experience at Wildwood.  GMD is a corporation registered in Indiana with its principal place of business in Rensselaer, Indiana.  GMD designs and fabricates custom machinery used in filtration production industries such as the HVAC industry.  GMD's principal owners are Scott Vollmer ("Vollmer") and Phil Albrecht ("Albrecht").  Vollmer performs the sales functions and Albrecht is in charge of operations, design work, and maintaining production schedules.

2

In early 2006, Wildwood and GMD began negotiations for GMD to design and build a number of custom machines for Wildwood to use in HVAC filter production. On March 20, 2006, Vollmer sent an email to Propersi and John Anderson at Wildwood. Vollmer's email thanked the men for visiting GMD and receiving a quote for machinery. The email went on to provide a proposal for GMD to construct a number of machines. Within the proposal, Vollmer stated that four machines could be ready in July, "earlier than 5 or 7 months!" Pl.'s Br. Ex. 3 at 12. Vollmer continued, stating that three additional types of machines could be ready "every three weeks after that." *Id*. Vollmer closed his discussion of the proposed delivery time by stating, "This staggered delivery schedule is a suggestion - if you are thinking about some other schedule - let me know." *Id*.

On April 4, 2006, GMD sent Wildwood a machinery quotation ("Machinery Quotation"), setting forth a detailed description of all the machines GMD would build for Wildwood, including a price quotation for each machine. Each page of the eight page Machinery Quotation describes a different type of machine. The bottom of each page bears the electronic signature of Vollmer and states that the quote is valid for at least thirty days.[1] The top of each page of the Machinery Quotation states, "The prices and terms on this quotation are not subject to verbal changes or other agreements unless approved in writing by the buyer and GMD." Pl.'s Br. Ex. 3 at 1-8. In addition, each page discusses a potential delivery time for the machines. Six of the eight pages state, "Delivery time; 4 – 5 months ARO ... With current GMD production Schedules." *Id*. The remaining two pages state, "Lead Time: 4 – 5 months ... With current GMD production Schedules." *Id*.

---

[1]Some pages state that the quote is valid for thirty days, other pages say the quote is valid for forty-five days.

On April 11, 2006, Wildwood issued a purchase order ("Purchase Order") to GMD for fabrication of over thirty pieces of machinery at a price of $601,132.00.  The payment terms for the machines, set forth in the Purchase Order, were thirty percent (30%) with the order; thirty percent (30%) within sixty days following the order; thirty-five percent (35%) per machine at the time of delivery; and five percent (5%) per machine thirty days following delivery.

Sometime after April 11, 2006, GMD issued a document titled "GMD Machinery Descriptions for Wildwood Industries, Inc.," which the parties refer to as an invoice ("Invoice"). The Invoice describes the technical specifications and provides a price for each machine.  The top of each page of the Invoice contains a provision identical to that contained in the Machinery Quotation, and provides, "The prices and terms in this quotation are not subject to verbal changes or other agreements unless approved in writing by the buyer and GMD."  Pl.'s Br. Ex. 3 at 9-12. The last page of the Invoice discusses the delivery dates of the machines.  It provides, "Delivery of these machines will be a staggered schedule agreed to between Wildwood and GMD.  GMD will invoice GCI Capital, Inc. for upcoming payment due, and also when individual machines are complete and shipped to Wildwood Industries, Inc."  *Id.* at 12.  Further, the Invoice states, "Lead Time 4 – 5 months ARO."  *Id.*  ARO stands for after receiving order.

On April 14, 2006, Wildwood made the initial thirty percent (30%) payment of $180,339.60. Approximately sixty days later, on June 13, 2006, Propersi made a site visit to GMD to evaluate progress of the fabrication work.  During this meeting, Propersi learned that GMD had not started work on Wildwood's machines.  Propersi testified at a January 23, 2007 deposition, that during the site visit, he asked Vollmer what GMD had done with the initial $180,339.60 payment.  According to Propersi, Vollmer responded that the payment had been generally used to operate GMD's shop.

4

Vollmer indicated that Wildwood's machines had been placed on GMD's production schedule, but that other machines were scheduled to be built first.

Wildwood was apprehensive about GMD's progress. Propersi testified at deposition that based on his prior business experience, he expected that he would have seen purchased materials and the beginning stages of fabrication work at GMD during his site visit. Propersi testified that after his site visit, he did not think that GMD could complete Wildwood's machines by the time he believed they were due to be delivered. Wilder represents in a declaration dated June 4, 2007, that he was also very concerned that GMD had not used Wildwood's initial payment for work on Wildwood's order. Wilder states that he feared that this could result in a shortage of funds available to GMD to complete the Wildwood order, or that the sixty day delay in starting production would result in delayed delivery of the machinery.

The communications between Vollmer and Propersi beginning on June 13, 2006, and continuing for the next several weeks reveal more about the parties' interaction and GMD's production process, and include the following:

> On June 13, 2006, Vollmer sent an email to Propersi prior to Propersi's site visit to GMD. The email discusses a potential delivery date for Wildwood's machines, stating, "As you know we quoted machines at 4 - 5 months and we need to start making decisions on your frame machine features, and a couple other items that we left open for discussion during machine fabrication."

> On June 15, 2006, Propersi emailed Vollmer and indicated that Wildwood would not issue a second progress payment until GMD produced a reconciliation and accounted for its use of Wildwood's initial payment.

> Later on June 15, 2006, Vollmer sent an email and attached letter to Propersi. The email from Vollmer to Propersi states, "it appears we are going to be able to move our schedule around to get to your first 1" rotary pleater a bit quicker. Won't know for a bit how much quicker." Vollmer's letter set forth GMD's sequence for fabricating machines. Vollmer states in the letter that GMD had not started building Wildwood's machines. The letter explains that GMD uses customer deposits and

progressive payments to effectively run its shop and maintain labor, materials, and overhead. The letter further states that Vollmer trusts he will receive the second progressive payment from Wildwood.

On June 16, 2006, Vollmer sent Propersi an email stating, "Our cash flow from customer deposits, run-off payments, and net 30 payments go to all the machines being built, completed, and net 30 after delivery. This is a flowing process and I don't feel there is a need for GMD to justify what is done with money they collect from customers as long as we comply with fabricating your machines. Expenses (raw materials, overhead, labor, etc.) are ongoing through the year as we build many machines. So for example, the run-off payment of 35% is not actual expenses for machines done either, because money rolls all through our production of machines. When we are 'starting' your machines I will be in touch routinely with written reports and photo updates."

On June 22, 2006, Vollmer sent Propersi an email, informing him that a GMD customer was willing to move its order back so that GMD could begin work in the next week to ten days on the first of Wildwood's machines.

On the afternoon of June 26, 2006, Propersi sent an email titled "Telephone Conversation" to Vollmer, which in relevant part, states, "If my memory is correct you expect to have the pleater completed within 5 weeks on or about June 28, 2006 or approximately one month ahead of the originally scheduled delivery commencement date."

Vollmer responded later on June 26, 2006, in an email to Propersi that states, in part, "GMD has not expended any money from Wildwood [sic] deposit at this time for their machines. We will start to do so when we receive the next progressive payment due to GMD and progress into design and building of the first pleater we have been able to move up in our schedule." The email states that the Purchase Order did not require GMD to provide reconciliations for the use of funds, and that GMD would not do so. The email also states that the design phase for the first rotary score pleater machine would start that week.

Later on June 26, 2006, Vollmer sent Propersi an email stating, "We have not commenced any work on your rotary pleater...between you and me - but lets get this payment thing done and over and I'll start sending progress reports as we move along on that machine."

On June 27, 2006, Vollmer sent Propersi an email, which states, "I am not holding your first machine hostage for the payment, but I feel that we have explained our procedures enough, the quote and your P.O. state payment schedules, and we certainly want to get started on your machines. Phil has told me that he can be

ordering some component parts tomorrow - that will be delivered in the manufacturers [sic] time frame to fit our fabrication timeframe [sic]."

Pl.'s Br. Ex. 3 at 15-23.

In his declaration, Wilder states that he monitored the communications between Vollmer and Propersi. Wilder states that Vollmer's communications increased his concerns that GMD would not be able to perform its obligations under the contract within four to five months. Wilder represents that based on these communications, he decided not to authorize a second payment to GMD.

On July 10, 2006, Vollmer sent Propersi an email with attached photographs. The photographs depict raw steel stock and a scoring shaft, materials to be used for a rotary pleater machine. Vollmer's email indicates that GMD ordered motors, gearboxes, pneumatics, and electric components for the first machine and was proceeding with production "in good faith and according to our fabrication schedule." Pl.'s Br. Ex. 3 at 24.

On July 12, 2006, Wildwood, through its attorney, sent a letter to Vollmer demanding adequate assurance of performance from GMD, pursuant to Indiana Code § 26-1-2-609, before Wildwood would make further payment. On July 13, 2006, Vollmer responded with a letter to Wildwood's counsel, listing items and raw materials ordered for Wildwood's machines and describing in house work completed to that point. Vollmer wrote, in part, "Design work complete and prints documented. Individual sets of prints done for machine shop component work and machinery builders work. ... Steel Shaft Round Stock ordered and arrived for the pleater scoring shafts, and belt accumulator shafts. ... Square steel stock ordered and arrived, cut into 4 sections, machine grooved for bearing frame upright assemblies. ... Belt shaft bearings ordered and arrived. Machine shop now cut / grind to fit bearing frame uprights." Pl.'s Br. Ex. 7 at 10.

7

On July 14, 2006, Vollmer sent a letter dated July 13, 2006, to Wildwood's counsel.  In the letter, Vollmer expresses his belief that adjusting GMD's production to build one machine ahead of schedule was a favor to Wildwood and alone should be enough to establish adequate assurance of performance.  Vollmer further states that the list provided in the July 13, 2006 letter, setting forth materials and production steps, also was adequate assurance of performance by GMD.  Vollmer asks that Wildwood provide adequate assurance of performance to GMD and make a second payment, which at that point, according to Vollmer was twenty-six days overdue.

Later on July 14, 2006, Wildwood, through its counsel, sent an email to Vollmer, advising that Wildwood did not find that GMD had offered adequate assurance that it could and would complete its contractual obligations.  Wildwood advised that it regarded GMD's failure to be a default and a repudiation of GMD's obligation to perform the Purchase Order.  Wildwood demanded the return of its initial payment to GMD within ten days.

## STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law.  In other words,

the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. The moving party may discharge its "initial responsibility" by simply "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *See id.* at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *See Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Rule 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *See also Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party.  *See NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994).  The court applies "the same standard in reviewing cross-motions for summary judgment." *Bleavins v. Bartels*, 422 F.3d 445, 449 (7th Cir. 2005).  A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact.  *See Anderson*, 477 U.S. at 249-50; *Doe*, 42 F.3d at 443.

## ANALYSIS

Wildwood and GMD trade accusations, each alleging that the other breached and/or repudiated the parties' contractual agreement.  Wildwood contends that GMD took no action to perform under the contract for sixty days following its execution and when Wildwood made a reasonable demand for adequate assurance of performance, GMD failed to provide a reasonable assurance, entitling Wildwood to rescind the contract.  GMD argues that Wildwood had no commercially reasonable or good faith grounds to allege that it was insecure as to GMD performing its contractual obligations.  GMD contends in the alternative that even if Wildwood did have legitimate insecurity, GMD provided timely and adequate assurance of performance.  GMD further argues, again in the alternative, that if GMD's response was not adequate, Wildwood failed to

provide a reasonable time for GMD to respond to Wildwood's final demand for assurances before repudiating the contract. GMD therefore contends that Wildwood's repudiation was a breach of the contract and that GMD is entitled to retain Wildwood's initial deposit according to the terms of the agreement.

The claims for breach of contract in this case are state law claims before the Court on diversity jurisdiction. There is no choice of law provision in the contract and both parties applied Indiana law in their briefing. The Court will apply Indiana law as well. *See S.A. Healy Co. v. Milwaukee Metro. Sewerage Dist.*, 50 F.3d 476, 478 (7th Cir. 1995); *Wood v. Mid-Valley, Inc.*, 942 F.2d 425, 427 (7th Cir. 1991) ("The operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits").

### A. Existence of a contract

In Indiana, the elements necessary to assert a breach of contract claim are the existence of a contract, the breach of that contract, and damages flowing therefrom. *See Collins v. McKinney*, 871 N.E.2d 363, 368 (Ind. Ct. App. 2007). The starting point for a breach of contract analysis is determining whether a valid contract exists, and that requires the presence of three elements: offer, acceptance, and consideration. *See Holloway v. Bob Evans Farms, Inc.*, 695 N.E.2d 991, 994 (Ind. Ct. App. 1998) (citing *Straub v. B.M.T. by Todd*, 645 N.E.2d 597, 598 (Ind. 1994)). In addition, "In order to be enforceable, a contract must be reasonably definite and certain in its material terms so that the intention of the parties may be ascertained." *Wenning v. Calhoun*, 827 N.E.2d 627, 629 (Ind. Ct. App. 2005) (citing *Berkel & Co. Contractors, Inc. v. Palm & Assocs., Inc.*, 814 N.E.2d 649, 655 (Ind. Ct. App. 2004)).

Here, there is no traditional contract in the sense of a single writing that bears the signatures of representatives of both parties.  However, the elements necessary for formation of a contract are present, as the parties agree, in three writings.  *See Noble Roman's, Inc. v. Ward*, 760 N.E.2d 1132, 1138 (Ind. Ct. App. 2002) (interpreting multiple writings together to determine parties' intent underlying contractual agreement); *Johnson v. Sprague*, 614 N.E.2d 585, 590 (Ind. Ct. App. 1993) (finding that a memorandum, an offer to purchase, and a check, combined to form an enforceable contract); 17 C.J.S. *Contracts* § 71 ("A binding agreement may be collected from various different writings provided there is no conflict between such writings in respect of the terms, parties, and the like").  First, the Machinery Quotation, sent by GMD to Wildwood on April 4, 2006, identifies the machines that GMD will build for Wildwood in detail, provides prices for the machines, and lists potential delivery dates.  The bottom of each page bears the electronic signature of the President of GMD and states that the Quotation is valid for at least thirty days.  Second, the Purchase Order, issued by Wildwood to GMD on April 11, 2006, ordered specific machines be built by GMD for a specified price.  The prices listed in the Purchase Order are slightly different than those in the Machinery Quotation, which the parties explain reflects adjustments resulting from final negotiations.  Third, the Invoice, like the Machinery Quotation, sets forth detailed descriptions of the machines and lists their prices.[2]  The Invoice also discusses the contractual delivery date(s) for the machines.

Analyzing the writings in terms of their role in establishing an enforceable contract, the Machinery Quotation operates as the offer because it sets forth the goods offered, their price, and expressly states that it will be held open for acceptance for at least thirty days.  Wildwood accepted

---

[2]Wildwood refers to the Invoice as the "confirmatory memoranda of the parties," *see* Pl.'s Resp. Br. at 11, and GMD acknowledges the Invoice as a contractual writing, *see* Def.'s Br. at 11.

the offer by issuing the Purchase Order, sent one week later, which accepted GMD's offer without materially changing the terms. The price of the machines reflected in the Purchase Order was approximately two percent less than the price reflected in the Machinery Quotation. These alterations did not affect the terms of the agreement to such a degree that the Purchase Order would be interpreted to reject the initial offer. *See* Ind. Code § 26-1-2-207 ("A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon"). The Invoice reflects the final price of the machines, as accepted in the Purchase Order, and adds a provision for the timing of delivery. Wildwood then made an initial payment to GMD as consideration for GMD's performance of building the machines. The writings, in combination with Wildwood's payment, evince the intent of the parties to contract for clearly defined goods. The parties agree that these writings combine to form an enforceable agreement.

The contract in this case involves the sale of goods and is thus governed by Indiana's Uniform Commercial Code ("U.C.C."), Ind. Code §§ 26-1-1-101, *et seq.* The U.C.C., in the official comment to U.C.C. § 2-201 dictates, "The only term which must appear is the quantity term which need not be accurately stated but recovery is limited to the amount stated. The price, time and place of payment or delivery ... may all be omitted." U.C.C. § 2-201 Comment; *see also Pepsi-Cola Co. v. Steak 'N Shake, Inc.*, 981 F.Supp. 1149, 1157 (S.D. Ind. 1997). Here, the writings set forth a specific quantity of machines for which the parties agreed. Finding the necessary elements of a contract present, the Court will now discuss the terms of the contract.

## B.  Terms of the contract

Each party contends that the terms of the contract are clear, unambiguous, and dictate an award of summary judgment in its favor.  However, when it comes to the contractual delivery term for the machines, the parties do not agree on a definite date, or for that matter a period of time. Interpreting a contract, the court cannot read the terms of the contract exclusive of other provisions, but should instead read a document as a whole.  *See Zemco Mfg., Inc. v. Navistar Int'l Trans. Corp.*, 270 F.3d 1117, 1124 (7th Cir. 2001) (applying Indiana law) (citing *First Fed. Sav. Bank of Ind. v. Key Markets, Inc.*, 559 N.E.2d 600, 603 (Ind. 1990)).  If an agreement is found to be unambiguous, a court may not consider evidence beyond the four corners of the contract.  *See Zemco*, 270 F.3d at 1124 (citing *Tri-Central High Sch. v. Mason*, 738 N.E.2d 341, 344 (Ind. Ct. App. 2000)).  A contract is ambiguous only if a reasonable person finds its terms subject to more than one meaning.  *See Evan v. Poe & Assocs., Inc.*, 873 N.E.2d 92, 98 (Ind. Ct. App. 2007) (citing *Dobson v. Citizens Gas & Coke Util.*, 634 N.E.2d 1343, 1345 (Ind. Ct. App. 1994)).  Applying this standard, a court will give a word or phrase its usual meaning, unless the contract as a whole makes clear that the parties intended another meaning.  *See Trustees of First Union Real Estate Equity & Mortgage Invs. v. Mandell*, 987 F.2d 1286, 1290 (7th Cir. 1993) (applying Indiana law).  Interpretation of a contract that is unambiguous and contains no uncertain terms is a question of law left to the court, *see Zemco*, 270 F.3d at 1123, but if the court determines that the contract is ambiguous and unclear, its meaning becomes a question for the trier of fact*, see Kessel v. State Auto. Mut. Ins. Co.*, 871 N.E.2d 335, 337 (Ind. Ct. App. 2007) (citing *Arrotin Plastic Materials of Ind. v. Wilmington Paper Corp.*, 865 N.E.2d 1039, 1041 (Ind. Ct. App. 2007)).

Here, the fundamental contractual terms, e.g., what goods are contracted for and the price of those goods, are unambiguously defined by the Machinery Quotation, the Purchase Order, and the Invoice. However, the required delivery date for the goods is disputed and unclear. The delivery date is discussed in the Machinery Quotation and the Invoice. Both documents contain similar language. The Invoice provides for a "lead time" of four to five months and the Machinery Quotation provides for a "lead time" of four to five months for some machines and a "delivery time" of four to five months for other machines. Both documents also contain an identical provision that is similar to a merger clause. A merger clause typically states that a document represents the entire and exclusive agreement between contracting parties, thereby eliminating the need to consult other writings. *See Smith, et al. v. Colgate-Palmolive Co.*, 943 F.2d 764, 767 (7th Cir. 1991) (applying Indiana law).

Here, the Machinery Quotation and Invoice state that they are "not subject to verbal changes or other agreements unless approved in writing by the buyer and GMD." Pl.'s Br. Ex. 3 at 1-12. Based on this clause, the delivery terms contained in the Invoice are controlling. The Invoice sets forth largely the same delivery terms as the Machinery Quotation, the only difference being that the Machinery Quotation provides that some machines had a "delivery term" rather than a "lead time." The Invoice sets forth its delivery term in writing and it was not objected to by either party. Thus, the Court finds that the delivery term contained in the more recent Invoice is controlling.

The Invoice addresses the delivery date in two separate provisions. First, it states, "Delivery of these machines will be a staggered schedule agreed to between Wildwood and GMD. GMD will invoice GCI Capital, Inc. for upcoming payment due, and also when individual machines are

15

complete and shipped to Wildwood Industries, Inc."  Pl.'s Br. Ex. 3 at 12.  Second, it provides, "Lead Time 4 – 5 months ARO."  *Id.*

Interpreting the Invoice, the parties disagree on the required contractual delivery date. Wildwood argues that according to the document, all machines must be delivered on a staggered delivery schedule within four to five months of the date of the Purchase Order.  In that case, to deliver the approximately thirty machines on a staggered schedule by mid September, GMD would almost certainly have had to deliver the first machine soon after the contract was formed and make the other deliveries frequently over the next four to five months.

GMD's interpretation of the Invoice's delivery term is quite different.  GMD contends that pursuant to the Invoice, the first machine was to be delivered within four to five months after receiving the Purchase Order and all other machines were to be delivered on a staggered delivery schedule thereafter.[3]  Under GMD's interpretation, the time for performance would be much longer than would be allowed under Wildwood's interpretation.  In its brief in opposition to Wildwood's Motion for Summary Judgment, GMD concedes that if the Court agrees with Wildwood that all machines had to be delivered within four to five months, "GMD admittedly could not have performed in time."  Def.'s Resp. Br. at 9.

_____

[3]The Court notes that GMD's argument is partially internally inconsistent.  In its brief in support of its Motion for Summary Judgment, GMD states the delivery time is, "four- to five-month lead time before delivery to commence ... with one machine as an exception to be delivered a bit earlier (in late July), and subsequent machines following at roughly three-week intervals."  Def.'s Br. at 11.  In portions of GMD's briefing, it cites to the March 20, 2006, email in support of its factual conclusion.  The March 20, 2006 email provides that four machines were to be delivered in late July and that only certain machines are subject to the three week staggered delivery provision. Throughout GMD's briefing, it argues for two clear delivery provisions.  First, GMD argues in support of staggered delivery, and second, it argues that delivery was to extend beyond five months.  The Court will interpret GMD's argument to support a delivery term containing those two requirements.

16

Based on the language of the Invoice and the parties' arguments, the Court finds that the delivery term is susceptible to multiple interpretations and that a reasonable person could agree with GMD's or Wildwood's interpretation. The Court reaches this conclusion primarily for two reasons. First, the term "lead time" is not defined by the Invoice and can be interpreted in several different ways. The term can reasonably be interpreted to support Wildwood's interpretation that "lead time" encompasses the entire production time for Wildwood's machines. Also, "lead time" can be reasonably be interpreted to support GMD's interpretation and indicate that GMD had four to five months before it was required to deliver any machines. "Lead time" indicates a time before some action or result. However, it is unclear whether "lead time" refers to the time before the start of performance or the time before the completion of performance.

The dictionary definitions for "lead time" support the conclusion that the term is ambiguous. GMD directs the Court to the American Heritage Dictionary of the English Language, which defines "lead time" as "[t]he time between the initial stage of a project or policy and the appearance of results." *American Heritage Dictionary of the English Language* (4th Ed. 2000) (visited most recently on October 10, 2007, at *http://www.bartleby.com/61/63/L0086300.html*). Conversely, the Webster's New Collegiate Dictionary defines "lead time" as "the period between the decision to begin a process (as the development of a new product) and the completion of the process." *Webster's New Collegiate Dictionary* 654 (1976). The American Heritage Dictionary definition is credible support for GMD's interpretation that "lead time" refers to the time between contracting and the start of performance. The Webster's New Collegiate Dictionary definition is equally supportive of Wildwood's interpretation that "lead time" refers to the period from start to finish of

an obligation.  These opposing definitions buttress the Court's conclusion that the term "lead time" is ambiguous.

The Court acknowledges that a dictionary is extrinsic evidence and recognizes that it consulted an extrinsic source to evaluate whether an ambiguity exists, which only with an affirmative answer would allow for other extrinsic sources to be consulted.  However, the Court is able to reach its final conclusion as to whether "lead time" is ambiguous independent of the dictionary definitions quoted above.  The definitions add additional support for the Court's conclusion.  Also, the Court points out that Indiana courts have consulted dictionaries to determine whether an ambiguity exists in the past, although not always in the same context.  *See Kutche Chevrolet-Oldsmobile-Pontiac-Buick, Inc. v. Anderson Banking Co.*, 597 N.E.2d 1307, 1309 (Ind. Ct. App. 1992) (consulting two dictionaries to determine whether use of "cash" in a written warranty agreement was ambiguous); *see also Lincoln Nat. Life Ins. Co. v. Transamerica Fin. Life Ins. Co.*, No. 1:04-CV-396, 2007 WL 710119, at *7 (N.D. Ind. Mar. 6, 2007) (explaining that in patent law claim construction, courts may consult extrinsic evidence, including dictionaries, in order to reach the correct conclusion).

The second basis for the Court's conclusion that the delivery term is susceptible to multiple interpretations is that the staggered delivery schedule referenced by the Invoice is unclear.  The Invoice states that the rate of stagger was "agreed to between Wildwood and GMD."  Pl.'s Br. Ex. 3 at 12.  The agreement referred to in the Invoice is not explained in the Invoice or in the other contractual writings.  The lack of any explanation for the staggered delivery schedule can be interpreted to support either party's interpretation.  Either the delivery must be staggered prior to five months, or it can be staggered beginning at the five month point extending forward.

18

Wildwood's interpretation, that all deliveries must be staggered within five months would be a demanding delivery schedule, but the Court finds that the language of the Invoice does nothing to foreclose this option as a valid interpretation.  GMD's interpretation of the provision providing for a staggered delivery after the four to five months of lead time is also supported by the plain language of the Invoice.  Other potential interpretations are also possible because the document gives no time frame for how staggered the deliveries were intended to be.

The Court concludes that the delivery term provided in the Invoice is susceptible to multiple interpretations by a reasonable person and is therefore ambiguous.  Analyzing the delivery date language of the Invoice is helpful but not conclusive as to any single interpretation.  The Invoice fails to set forth a complete staggered delivery term and fails to define what period of time the "lead time" accounts for.  The interpretations suggested by both parties are reasonable readings of the document.  Each interpretation would result in a much different required delivery term, which has the potential to affect the outcome of the underlying breach of contract claims.  The underlying claims ultimately depend on whether Wildwood's insecurity in GMD's performance was justified - which is more likely with a shorter delivery term - and whether GMD acted reasonably to assuage any insecurity that Wildwood was justified in feeling.  *See* Ind. Code § 26-1-2-609.

If an ambiguity arises solely because of contractual language and not because of extrinsic facts, interpretation of the contractual language is a question of law for the court to decide.  *See Oxford Financial Group, Ltd. v. Evans*, 795 N.E.2d 1135, 1141 (Ind. Ct. App. 2003); *Boswell Grain & Elevator, Inc. v. Kentland Elevator & Supply, Inc.*, 593 N.E.2d 1224, 1227 (Ind. Ct. App. 1992) (citing *Key Markets*, 559 N.E.2d at 604).  If, on the other hand, the ambiguity requires extrinsic evidence to be determined, its construction is a question to be resolved by the trier of fact.  *See*

19

*Boswell Grain*, 593 N.E.2d at 1227 (citing *Keithley's Auctions Serv. v. Children of Jesse White*, 579

N.E.2d 657, 659 (Ind. Ct. App. 1991)).  When a court issues a ruling at summary judgment on a

contract claim, the court has determined either that the contract is unambiguous and the question is

one of law, or that any ambiguity in the contract can be resolved without the aid of a factual

determination.  *See Cinergy Corp. v. St. Paul Surplus Lines Ins. Co.*, 873 N.E.2d 105, 110 (Ind. Ct.

App. 2007) (citing *Perryman v. Motorist Mut. Ins. Co.*, 846 N.E.2d 683, 687 (Ind. Ct. App. 2006)).

Having found that the contract contains an ambiguous provision susceptible to multiple

reasonable interpretations, the Court must determine whether the ambiguity results solely from the

contractual language, which is a question of law, or if the ambiguity involves extrinsic evidence,

which is a question for the trier of fact to resolve.[4]  Tellingly, the parties both rely on extrinsic

evidence to support their interpretation of the contract's delivery date.  Each party cites writings

outside the four corners of the agreement in support of its interpretation.  The Court agrees that

external evidence is required to construe the delivery date of the contract and finds that

interpretation of the agreement is not a question of law for the Court to decide at summary judgment.

The Court is also the trier of fact in this matter.  A two-day bench trial is scheduled to begin

---

[4]Having found that the contract is ambiguous as to a delivery date, the Court finds it appropriate to mention the Indiana courts' recent abrogation of a long recognized distinction between two types of ambiguities.  In 2006, interpreting a trust agreement, the Supreme Court of Indiana abandoned the distinction between patent and latent ambiguities.  *See University of Southern Ind. Foundation v. Baker*, 843 N.E.2d 528, 535 (Ind. 2006) ("the latent/patent distinction has not been consistently applied and no longer serves any useful purpose").  Subsequently, in an unpublished opinion, the Court of Appeals of Indiana extended the abrogation to all contracts.  *See Hartwell v. United Consulting Engineers, Inc.*, 858 N.E.2d 1074, n.1 (Ind. Ct. App. 2006) ("although *Baker* dealt specifically with construction of a trust, we see no reason why its rejection of 'latent'/'patent' distinctions would not apply with equal force to contracts").  This shift away from a distinction between ambiguities has been encouraged for years by the United States Court of Appeals for the Seventh Circuit.  *See Amoco Oil Co. v. Ashcroft*, 791 F.2d 519, 520 (7th Cir. 1986) ("Indiana adheres to the ancient, mysterious, and much-derided distinction between 'patent' and 'latent' ambiguities in contracts and wills").

November 19, 2007, when the Court will hear evidence as to the correct interpretation of the contract's delivery date.

### C.  Extrinsic evidence

Both parties rely on writings outside the contract to support their interpretation of the delivery date, such as emails sent both before and after the contract's formation, and deposition transcripts and declarations provided after contract formation.  Indiana's U.C.C. § 26-1-2-202, the parol evidence rule, contemplates the use of external evidence to interpret the meaning of an ambiguous contract and provides:

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:
>
> (a) by course of dealing or usage of trade (IC 26-1-1-205) or by course of performance (IC 26-1-1-205); and
>
> (b) by evidence of consistent additional terms, unless the court finds the writing to have been intended as a complete and exclusive statement of the terms of the agreement.

Ind. Code § 26-1-2-202.

Each party in this case looks to writings outside the contractual documents to support its interpretation of the required delivery date.  The contract contains a provision similar to a merger clause that limits the finder of fact's ability to consult external evidence.  The first paragraph on the first page of both the Machinery Quotation and the Invoice provides, "The prices and terms on this quotation are not subject to verbal changes or other agreements unless approved in writing by the buyer and GMD."  Pl.'s Br. Ex. 3 at 8.  This provision precludes the use of extrinsic evidence that would change the terms of the Machinery Quotation or the Invoice.  It does not preclude use of

21

extrinsic evidence that would clarify or supplement the terms contained within the contractual writings. Here, the use of extrinsic evidence is for the purpose of clarifying the terms of the Invoice (not to change the terms or otherwise agree). Thus, the Court deems that using external evidence is not inconsistent with the terms set forth by the contractual language.

The parties spent a considerable amount of their summary judgment briefing arguing over one piece of external evidence. GMD argued that the evidence is properly considered relevant external evidence, and Wildwood argued that the evidence should be excluded pursuant to the parol evidence rule. The document at issue is the March 20, 2006 email, sent by Vollmer to Propersi and John Anderson at Wildwood. The email provides, in part, that four machines would be delivered in July; that three types of machines, of which at least fifteen total units were ordered, would be delivered once every three weeks after the July deliveries; and that the proposed staggered delivery schedule was a suggestion open for a counter proposal by Wildwood. Wildwood never submitted a counter proposal.

Wildwood argues that the email is inadmissible parol evidence because it does not provide any specific contractual terms and it is merely an invitation for Wildwood to make further proposals regarding terms such as payment and delivery. Wildwood also contends, albeit inconsistently with its first argument, that the email is inadmissible because it purports to change the terms of the Invoice, not merely explain the contract's existing terms. In support of this argument, Wildwood cites Indiana Code § 26-1-2-202, which provides, "such terms as are included [in the contract] may not be contradicted by evidence of any prior agreement." Ind. Code § 26-1-2-202.

The Court finds that the email is proper parol evidence and may be considered to help clarify the contract's terms. The email does not provide any specific, binding contractual terms. It quite

clearly states that the delivery term is a suggestion, open to counter offer.  The email provides more background to the parties' negotiations leading up to the contract.  It shows that the parties contemplated a staggered delivery schedule for some of the machines.  The email also demonstrates that GMD originally believed that only some machines would be due for delivery in the initial months of the contract.  While the email does not resolve the delivery date ambiguity, it will potentially be useful in determining the most accurate meaning of the contract's delivery terms.

To the extent that the email contains terms different than those in the contract, for example discussing a five to seven month delivery time frame whereas the contract discusses a four to five month delivery time frame, the Court does not and will not rely on the email.  The Court relies on the email for the purpose of gathering background information and an explanation of the parties' use of language that is facially ambiguous but affects the terms of their agreement.

In response to GMD's reliance on the March 20, 2006 email, Wildwood submitted the declaration of Wildwood operations manager, Dominic Propersi.  GMD contends that several portions of Propersi's declaration are unsupported by any evidence and are therefore not persuasive. In relevant part, Propersi's declaration provides, "I may have received an email from Scott Vollmer on March 20, 2006 as part of these tentative, pre-contractual discussions.  This email was not a quote and did not have specific terms for a contract."  Pl.'s Br. Ex. 1 at 1.  The Court finds that Propersi's conclusion that his discussions with Vollmer do not affect the terms of the contract are attempts by Propersi to draw a legal conclusion, which is beyond his area of knowledge in this matter. Propersi's legal conclusion does not influence the Court's analysis, and his qualification of the email as a tentative, pre-contractual communication is not controlling. *See Schneider v. United States*, 257 F.Supp.2d 1154, 1158 (S.D. Ind. 2003) (quoting Fed. R. Civ. P. 56(e)) (pursuant to Fed. R. Civ. P.

56(e), affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify on the matters stated therein").

Propersi's declaration goes on to state, "I understood the term for delivery of 'four to five months ARO' ... to mean four to five months after receipt of Wildwood's purchase order." Pl.'s Br. Ex. 1 at 1.  The Court finds that Propersi's subjective understanding of the parties agreement, while relevant, is not determinative.  The interpretation of the finder of fact will determine the outcome of any factual question in this litigation.

In addition to the March 20, 2006 email, the parties refer to several other documents, as persuasive external evidence for the trier of fact to consider.  Included among these documents are Propersi's deposition transcript; a June 13, 2006 email from Vollmer to Propersi; a GMD spreadsheet titled "Job Summary Aug. 2005 thru [sic] Jan 8, 2007;" and a June 26, 2006 email from Propersi to Vollmer bearing the subject heading "Telephone Conversation."

**CONCLUSION**

Despite the Court's best efforts, a resolution of the ambiguity produced by the parties' unartful drafting of the contractual delivery date is not possible at this stage of litigation.  The inferences and findings that the Court would have to draw to reach a conclusion are factual and not for the Court to decide at this time.  The factual interpretation of the delivery date may well affect the outcome of this case.  Therefore, this matter will proceed toward a resolution of the terms of the contractual agreement by the trier of fact at the November 19, 2007 bench trial.  For the foregoing reasons, the Court **DENIES** the Motion for Partial Summary Judgment [DE 33], and **DENIES** the Plaintiff's Motion for Summary Judgment on its Claim and on Counterclaim [DE 36].  There are

24

primarily two areas of factual issues that remain unresolved to be addressed at the November 19, 2007 bench trial: (1) the date that GMD was required to deliver the machines to Wildwood pursuant to the terms of the contract; and (2) under Indiana Code § 26-2-1-609, whether Wildwood had reasonable grounds for insecurity with respect to GMD's performance of its contractual obligations and whether GMD provided reasonable assurance of performance to Wildwood within a reasonable time.

SO ORDERED this 15th day of October, 2007.

 s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record