UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION


WILDWOOD INDUSTRIES, INC.,    )
             Plaintiff    )
                     )
v.                            )       CASE NUMBER 4:06-CV-124
                     )
GENUINE MACHINE DESIGN, INC.,    )
             Defendant    )


## OPINION AND ORDER


       This matter is before the Court on the Complaint [DE 1] filed by the
Plaintiff Wildwood Industries, Inc. on September 1, 2006; the Answer and
Affirmative Defenses [DE 9] and Counterclaim [DE10] filed by the Defendant
Genuine Machine Design, Inc. on October 17, 2006; and the Answer and
Affirmative Defenses to Counterclaim [DE 12] filed by the Plaintiff Wildwood
Industries, Inc. on November 6, 2006.

       On July 28, 29, and 30, 2008, Bench Trial proceedings were held in
Lafayette, Indiana.  On August 1 and September 3, 2008, Bench Trial proceedings
were held in Hammond, Indiana.

       In determination of these issues and based upon the record of proceedings
the Court FINDS, ORDERS, ADJUDGES, and DECREES:


## PROCEDURAL BACKGROUND


       1.  On September 1, 2006, the Plaintiff Wildwood Industries, Inc.
(hereinafter referred to as Wildwood Industries or simply Wildwood) filed its

Complaint alleging breach of a contract by Genuine Machine Design, Inc. (hereinafter referred to as Genuine Machine Design or GMD) for the purchase of manufacturing machinery to be fabricated by GMD.

2. On October 17, 2006, the Defendant Genuine Machine Design filed its Answer and Affirmative Defenses denying that it breached the contract and filed its Counterclaim alleging breach of the same contract and anticipatory repudiation by Wildwood Industries.

3. On November 6, 2006, the Plaintiff Wildwood Industries filed its Answer and Affirmative Defenses to Counterclaims denying that it breached the contract, alleging that Genuine Machine Design breached the contract by failing to provide adequate assurance of performance, and asserting other affirmative defenses.

4. Jurisdiction by this Court over this case is based upon diversity of citizenship pursuant to 28 U.S.C. §1332.

5. On December 1, 2006, this case was reassigned to the undersigned Magistrate Judge. The parties filed forms of consent to have this case assigned to a Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. §636(c).

6. Following the filing by each party of cross Motions For Summary Judgment, the Court issued an Opinion And Order on October 15, 2007, finding the existence of genuine issues of material fact and denying both cross Motions For Summary Judgment.

7. The case proceeded to trial and five days of Bench Trial proceedings were held on July 28, 29, and 30, August 1, and September 3, 2008. The Court received evidence.

8. Following the trial, the Court ordered the parties to file Proposed Findings of Fact and Conclusions of Law and summary written arguments by October 3, 2008. After an extension of that deadline was granted, both parties timely filed those documents on October 10, 2008.

## STANDARD OF PROOF

9. This matter being a civil case, Plaintiff Wildwood Industries carries the burden to prove its claims alleged in its Complaint and affirmative claims in its Answer to the Counterclaim, and Genuine Machine Design carries the burden to prove its affirmative claims in its Answer and claims alleged in its Counterclaim, all by a preponderance of the evidence. Another way of stating this standard is that each party must prove that a claim or proposition is more probably true than not true.

## FINDINGS OF FACT

10. The findings of fact herein are based upon the trial evidence. Where factual conflicts in the evidence exist, the findings herein are the facts the Court has determined to be more credible after resolving the factual conflicts.

11. Wildwood Industries is a corporation with its principal place of business located at Bloomington, Illinois. Wildwood manufactures air filtration products for heating, ventilation, and cooling systems. Their products include filters made in fiberglass laminated media and ones made in heat set pleated media.

12. At all relevant times, Gary Wilder was the President of Wildwood Industries and Dominic Propersi was Executive Vice-President and Operations Manager. When the contract in dispute in this case was entered, Wildwood had about 525 employees and by the time of trial it had about 720 employees. Wildwood has three large facilities in Illinois and one in Ontario, Canada.

13. Genuine Machine Design is a corporation with its principal place of business located at Rensselaer, Indiana. GMD performs custom design and fabrication of machinery used in the production of air filtration products. About 25% of its production are standard machines; about 75% are custom designed machines.

14. At all relevant times, Scott Vollmer was President of, co-owner of, and

principal sales person for, GMD and L. Philip Albrecht, Jr. was Secretary-Treasurer, co-owner, machinery designer, and director of manufacturing. GMD has one relatively small facility in Indiana (approximately 10,000 square feet) and at all relevant times it had 5 - 6 employees other than Vollmer and Albrecht.

15. At all relevant times, Wildwood Industries and GMD both dealt in goods of the kind they produced (Wildwood producing air filtration products; GMD producing fabricated production machinery) and held themselves out as having knowledge or skill peculiar to the practices or goods of the kind they produce.

## 1.    CONTRACT FORMATION

16. Early in 2006, Wildwood and GMD began discussions for GMD to design and build several custom machines for Wildwood to use in air filtration production. On March 17, 2006, Dominic Propersi and John Anderson, both of Wildwood, traveled to GMD's facility in Indiana for a site visit, toured it, and further discussed with Scott Vollmer, of GMD, a possible order. Prices were included as a subject of discussion. At this meeting Wildwood informed GMD that Wildwood wanted to receive the machines to double its air filtration capacity by August or September 2006.

17. On March 20, 2006, Scott Vollmer of GMD sent an e-mail message to Dominic Propersi and John Anderson of Wildwood which included a proposal for GMD to construct several machines for Wildwood and stated that four machines could be ready for delivery in July 2006, "earlier than 5 or 7 months," that three additional types of machines could be ready "every three weeks after that," and that "(t)his staggered delivery schedule is a suggestion – if you are thinking about some other schedule – let me know." Wildwood did not let GMD know if it wanted a different delivery schedule.

18. On April 4, 2006, GMD sent Wildwood an eight page "Machinery Quotation" describing machines to be built by GMD and quoting a price for each machine. The top of each page bears the statement "The price and terms on this quotation are not subject to verbal changes or other agreements unless approved in

writing by the buyer and GMD . . . Terms inconsistent with those stated herein which may appear on Purchaser's formal order will not be binding on GMD. Order cancelled by customer – GMD retains deposit amount." Six of the eight pages each state "Delivery time; 4 - 5 months ARO . . . With current GMD schedules." ARO is an acronym meaning after receipt of order. The other two pages each state "Lead time; 4 - 5 months . . . With GMD production schedules."

19. On April 11, 2006, Wildwood issued to GMD a "Purchase Order " (PO # W2168) for 31 machines and related items[1] for a total purchase price of $601,132.00 (after a 2% discount that GMD offered), 30% to be paid the date of the Purchase Order, 30% to be paid within 60 days of that date, 35% to be paid at the time of delivery, and 5% per machine to be paid within 30 days following delivery.[2] Wildwood's Purchase Order form included a place for "Required Date" for delivery of the machines, but that section was left blank by Wildwood; no other delivery terms were stated to vary the terms of GMD's April 4, 2006 quote.

20. On April 11, 2006, GMD issued an Invoice (Invoice # 041106 - wii) describing the technical specifications for each machine and stating the price of each machine. At the top of the multi-page attachment (following the summary cover page) GMD's invoice stated "The price and terms on this quotation are not subject to verbal changes or other agreements unless approved in writing by the buyer and GMD. . . Terms inconsistent with those stated herein which may appear on Purchaser's formal order will not be binding on GMD. Order cancelled by customer – GMD retains deposit amount." Near the end of the GMD Invoice, GMD stated that "Delivery of these machines will be a staggered schedule agreed to between Wildwood and GMD" and a bit further it stated "Lead time 4 - 5 months ARO."

---

[1] The Purchase Order included a laminator, four 1" rotary score pleaters, five G-7 pleat cutters, nine drying chambers, nine assembly tables, a framing machine, a 5" rotary score pleater, and a 1/4" to 1/2" adjustable rotary pleater with two heads.

[2] The Purchase Order was dated April 11, 2006. Sixty days from that date was June 10, 2006. GMD's April 11, 2006 Invoice mistakenly indicates that the second 30% payment was due June 18 rather than June 10. The Court concludes that the parties intended the second 30% payment to be due June 18, 2006.

## 2.     AFTER CONTRACT FORMATION

21.  Wildwood Industries arranged financing of its purchase of the machinery by borrowing the money from GCI Capital, Inc. (Minnwest Capital Corporation).  The April 11, 2006, Invoice (Invoice # 041106 - wii), issued by GMD, was submitted directly to Wildwood Industries' lender GCI Capital, Inc. and copies were sent to Dominic Propersi and John Anderson, both of Wildwood. Wildwood's President Gary Wilder authorized the lender to make the first payment (30% of the total contract price).  GMD received that first payment in the amount of $180,339.60 on April 17, 2006.  Although the contract required Wildwood to make that final payment at the time its Purchase Order was submitted to GMD (April 11, 2006), Wildwood's first payment was made six days late.

22.  It was, and is, GMD's policy and practice to schedule a machine order on its production calendar only after both a written purchase order and payment of the deposit amount have been submitted to GMD by the customer.  So, on or shortly after April 17, 2006, GMD scheduled production of the Wildwood Industries' order on its production calendar.  GMD needed to both design and fabricate all of the custom designed machines ordered by Wildwood Industries which would be produced by GMD (most of the order) and not sub-contracted by GMD to another manufacturer.

23. By May 2, 2006, Dominic Propersi of Wildwood Industries had informed Scott Vollmer of GMD that the first machine Wildwood wanted to be completed and delivered was a 1" rotary score pleater and that Wildwood wanted delivery "as early as possible."  On May 2, 2006, Vollmer stated in an e-mail message to Propersi:

> Time frame of when you could get the first pleater is very difficult
> yet to predict.  Please allow us a bit more time for our schedule
> to move along more.  We know that you want to have that machine
> as early as possible so we will make it a priority along with a
> cutter, and also as we move along – decisions will be made for
> scheduling of other machines.

24.  Dominic Propersi of Wildwood responded by e-mail message the same day, but did not object to the uncertain delivery schedule for any of the machines nor mention anything about scheduling or delivery times.

25.  With the June 18, 2006 due date for the second $180,339.60 payment drawing near, on June 12, 2006, Dominic Propersi of Wildwood Industries sent an e-mail message to Scott Vollmer of GMD stating that he planned to arrive at the GMD facility the next day for a site visit.  On the morning of June 13, 2006, Vollmer sent an e-mail message to Propersi stating, in part:

> Glad you are coming by . . . As you know we quoted machines 4 - 5 months and we need to start making decisions on your frame machine features, and a couple other items that we left open for discussion during machine fabrication.  Design work/prints for machines of yours we have laid out for scheduling are in order.  Your choice is to have one of your 1" nominal rotary pleaters done first is OK with us and we will discuss that also.  As far as a "progress" report – it will be minimal at this time because fabrication is yet to get going – our machine shop will be first to start making parts, component items will arrive (motors, gearboxes, pneumatics, electricals, etc.).  Then photo and written update will be beneficial to Wildwood.  I will look to see you this afternoon for discussions – but since items we will talk about are a bit away yet, you can schedule your trip for a date about 2 weeks away.  Your call Dominic.

26.  At the June 13, 2006 site visit to GMD, Dominic Propersi of Wildwood Industries learned from Scott Vollmer of GMD that fabrication had not yet started for any of the machines[3], that Wildwood's order had been placed on the GMD production schedule, that the other orders ahead of it needed to be completed first, detailed specifications for Wildwood's machines were further discussed, and Propersi reaffirmed that Wildwood needed delivery of the 1" rotary score pleater as soon as possible.  Propersi expressed to Vollmer little, if any, disappointment that fabrication of Wildwood's machines had not yet begun.  Vollmer and Propersi

---

[3]L. Philip Albrecht, Jr. of GMD had in fact finished the design work for Wildwood Industries' 1" rotary score pleater before the June 13, 2006 site visit but, apparently, Scott Vollmer was then unaware of that fact and Vollmer did not communicate it to Dominic Propersi during the June 13, 2006 site visit.

discussed the possibility of GMD asking another of its customers which was ahead of Wildwood on the GMD production schedule to defer and take a production time slot after Wildwood's time slot so that the 1" rotary score pleater could be built as soon as possible.[4] At the site visit, Propersi did not express any serious concern about the machine fabrication having not yet begun and he expressed no thoughts or hints at that time of Wildwood considering withholding its second $180,339.60 payment which was due a few days later. Immediately following the business discussions, Propersi and Vollmer had lunch together and engaged in miscellaneous non-business conversation, including discussion of their children's softball participation.

27. Following the site visit, and still on the same day as the site visit, Scott Vollmer of GMD sent to Dominic Propersi of Wildwood Industries an e-mail message stating:

> Thanks for coming over and I know we accomplished a lot for machine features and here is a list of other stuff for you to get to us, and also a list of things we did decide . . . Thanks again Dominic and I will certainly work the angle we talked about that may get your machine up a notch in our production schedule.

Propersi did not respond to this post-site visit e-mail message nor otherwise seek clarification or modification of GMD's production or delivery times for Wildwood's other machines.

28. Sometime between June 13, 2006 (when Dominic Propersi of Wildwood Industries made a site visit to GMD's facility), and June 15, 2006 (when Propersi sent an e-mail message to Terry Forsburg of GCI Capital), Wildwood's President Gary Wilder decided to withhold Wildwood's second $180,339.60 payment due

---

[4]This customer was Ed Case and his business BLC West who, at that time, was expressing to GMD some indecision or second thoughts about its machine specifications after having submitted its purchase order and paying its deposit for 4 - 5 machines. Scott Vollmer did in fact ask Ed Case and BLC West to give up their original time slot on GMD's production calendar, citing a large machine order that GMD had received (Wildwood Industries' order). Ed Case and BLC West agreed with GMD to give up its priority time slot in the GMD production schedule and move behind Wildwood in the schedule. Vollmer informed Wildwood of this development in an e-mail message to Propersi on June 22, 2006.

June 18, 2006, and not pay it to GMD (Gary Wilder testified in his January 22, 2008 deposition "I probably told him [Dominic Propersi] there was going to be no second payment. My mind was made up after the visit. There was nothing after that that was going to change my mind").

29. Soon after his return from the June 13, 2006 site visit, Dominic Propersi of Wildwood Industries reported to Wildwood's President Gary Wilder. Propersi had decided to authorize GCI Capital to pay to GMD the second $180,339.60 payment. However, Wilder overruled Propersi. Wilder had already decided not to authorize the second payment to GMD. Wilder wanted an accounting of GMD's use of the money from the first $180,339.60 payment. On June 15, 2006, Propersi sent an e-mail message to Terry Forsburg of the lender, GCI Capital, sending copies to Gary Wilder and Scott Vollmer, stating, in part:

> Gary hotly contested, and rightfully so, my decision to pay GMD the progress payment that is due this week. After being told by Scott Vollmer that they had nothing to show me I failed to ask where they had spent the $180,339.60 that they were paid on April 14 [sic] of this year. By copy of this e-mail to Scott Vollmer I am requesting receipt of a reconciliation of the expenditure of the funds related to the initial payment prior to release of any subsequent payments. I will advise you when I have received the reconciliation and will authorize payment of the progress payment at that time.

No deadline or time frame for GMD to respond to this request for an accounting ("reconciliation") was mentioned.

30. The next day, June 16, 2006, Scott Vollmer of GMD responded by e-mail message to Dominic Propersi of Wildwood Industries, sending a copy to Wildwood's President Gary Wilder, stating, in part:

> Please find attached a letter of response explaining concerns you have with progress of your machines with GMD at this point. I have also worked with Phil and it appears we are going to be able to move our schedule around to get your first 1" rotary pleater to you a bit quicker. Won't know for a bit how much quicker – but we will do our best to help you produce the pleats/filters you have all ready

9

[sic] sold.

In the attached letter, addressed to both Gary Wilder and Dominic Propersi, Vollmer described GMD's procedure for processing and scheduling customer orders and denied that on the site visit Propersi expressed any concern to Vollmer about lack of progress on fabrication work on Wildwood's machines. In the letter, Vollmer stated, in part:

> Dominic [Propersi] understood that procedure (scheduling and production) and did not express any concern about where GMD is in the above process. The lead times for your machines were discussed and accepted at the initial time Wildwood visited and of course every customer wants their machine as fast as it can be built. We have a production schedule of machines that is set by first received deposit – first built basis so there are other machines ahead of you and other machines behind you.

Regarding the request for GMD to account for its use of the first $180,339.60 payment, Vollmer stated in the letter, in part: "our customer's [sic] deposits and progressive payments are used to effectively run our shop by maintaining labor, materials, and overhead."

31. On the same day, June 16, 2006, Dominic Propersi of Wildwood Industries sent an e-mail message to Scott Vollmer of GMD, again requesting an accounting, but not stating any concern about the production schedule, and reaffirming the sales contract between the parties. In the e-mail message Propersi stated, in part:

> Having been involved in the design, fabrication, setup and installation of production lines I am acutely aware of the sequence of events that must take place to achieve the desired results and I certainly find no fault with your procedures . . . I appreciate your production position of first in – first out[;] however, that does not account for the expenditure of the deposited funds since the balance of your customers would have already paid 60% deposits. Being in a niche business ourselves we can certainly appreciate the ability of a specialty equipment fabricator versus that of an off the shelf piece

of equipment. That is why we selected GMD to fabricate this machinery. We certainly have no regrets about the decision and are merely asking for an accounting of where or on what our funds were spent. We too are looking forward to working with GMD and we too feel that the GMD machines will be a valuable asset to our production capabilities.

32. On that same day, June 16, 2006, Scott Vollmer of GMD sent an e-mail message to Dominic Propersi of Wildwood Industries stating, in part:

On any of our customers['] machine orders – there is no tangible evidence this early on with machines. I did not say that the information we worked on was in any way connected to the capital investment of your deposit. I just said that it was important that we had time to review and get that information when fabrication does start. Our cash flow from customer deposits, run-off payments, and net 30 payments go to all the machines being built, completed, and net 30 after delivery. This is a flowing process and I don't feel there is a need for GMD to justify what is done with money they collect from customers as long as we comply with fabricating your machines. Expenses (raw materials, overhead, labor, etc[.]) are ongoing through the year as we build many machines. So for example, the run-off payment of 35% is not actual expenses for machines done either, because money rolls all through our production of machines. When we are "starting" your machines I will be in touch routinely with written reports and photo updates.

33. On June 18, 2006, the date the second $180,339.60 payment was due to be paid to GMD, Wildwood Industries did not authorize or make the payment, so the payment became delinquent. At that point in time when Wildwood became delinquent in its contract payment, its main concern appeared to be its desire to obtain an accounting from GMD as to how GMD used the first $180,339.60 payment. Any concern by Wildwood about GMD's production schedule and delivery times was a distant secondary concern, if that. At that time, Wildwood appeared to have little, if any, concern about GMD's ability to perform its contractual obligation to ultimately fabricate and deliver the machines.

34.  On June 22, 2006, Scott Vollmer of GMD sent an e-mail message to Dominic Propersi of Wildwood Industries informing Wildwood that another GMD unnamed customer (Ed Case and BLC West) had agreed to give up its time slot on the GMD production schedule and drop to a later time slot which would enable GMD to complete fabrication of Wildwood's first machine (1" rotary score pleater) earlier than it otherwise could.  The e-mail message states, in part:

> When you were here – you expressed a major desire to try and get your first pleater as much earlier as possible because you had sold pleats/filters ahead of getting your machinery.  I told you that I had an opportunity to possibly have a customer ahead of you change his machine order behind you based on some decisions he has yet to research for the exact type of machine he may want to change to.  I spoke to him yesterday after Terry and I talked and that customer is indeed willing to give his production spot to another customer (Wildwood – but he does not know who) so that he can have more time in decisions he will need to make.  This will move your first pleater up in the schedule for Phil to addend the prints of your type of pleater and start the design changes for what you will need in your machine.  He will be doing that next week – 10 days max.  During that work – he will also be ordering the longest lead time component parts so [sic] see that they arrive at GMD to coordinate with our machine shop and machine builders.

In that e-mail message, Vollmer also informed Wildwood that Vollmer had discussed the issue of an accounting ("reconciliation") and the need for the second $180,339.60 payment to be made with Wildwood's lender, GCI Capital, and that he had provided GCI Capital with a copy of his (Vollmer's) June 16, 2006 explanatory letter previously sent to Propersi.

35.  On June 26, 2006, Dominic Propersi of Wildwood Industries sent an e-mail message to Scott Vollmer of GMD, essentially stating that Wildwood expected GMD to complete fabrication of the first machine (1" rotary score pleater) two days later, on or about June 28, 2006.  That same day, Vollmer responded by e-mail message to Propersi, essentially stating that: the terms of their contract did not require an accounting ("reconciliation") by GMD of its use of Wildwood's payments; GMD had not spent any of the money from Wildwood's

first $180,339.60 payment on work for Wildwood; that is how GMD normally conducts business; GMD would start design work on Wildwood's 1" rotary score pleater that week and order parts and make other preparations within the next ten days; upon Wildwood's payment of the second $180,339.60 payment, then GMD would spend that money on the costs of fabrication of Wildwood's machines; GMD would keep Wildwood informed with written progress reports and photos; and asking that Wildwood make its overdue second $180,339.60 payment. Still on the same day, approximately two hours later, Vollmer sent Propersi another e-mail message stating, in part: ". . . lets [sic] get this payment thing done and over and I'll start sending progress reports as we move along on that machine. I hope tomorrow to receive word from you that Wildwood is transferring the second payment."

36. On June 27, 2006, Scott Vollmer of GMD sent to Dominic Propersi of Wildwood Industries an e-mail message stating, in part:

> With the opening I have created in our schedule that we can put your first rotary pleater into – we need you to make the progressive payment. I am not holding your first machine hostage for the payment, but I feel that we have explained our procedures enough, the quote and your P.O. state payment schedules, and we certainly want to get started on your machines. Phil has told me that he can be ordering some component parts tomorrow – that will be delivered in the manufacturers [sic] time frame to fit our fabrication time frame. He could also be doing design work for prints to give to the machine shop. You, John Anderson, and I discussed incremental finishing and shipment of machines to you as they are completed by us, and you have chosen the rotary pleater as first one. Our machine shop can also be running parts for your laminator so they will be ready when the builder starts framing. Please resolve the payment/ reconciliation issue with Gary – so GMD can get going. Your rotary pleater will be started by our machine builder next week, and the laminator by another machine builder soon after that. This has gone on for coming [sic] two weeks. Please confirm the payment is being wired.

37. On the same date, June 27, 2006, and at nearly the same time of day, Dominic Propersi of Wildwood Industries sent an internal e-mail message to its President Gary Wilder stating, in part: "GMD has not performed in accordance with the implied contractual commitment of expending the initial down payment on tangible items required to complete the P.O." That e-mail discussion was about whether Wildwood should make the second $180,339.60 payment and Wildwood's concern over GMD not having provided an accounting of its use of the first $180,339.60 payment funds. In the e-mail message, Propersi made no mention of concern about a delivery schedule for Wildwood's machines.

38. On June 29, 2006, Dominic Propersi of Wildwood Industries sent an e-mail message to Scott Vollmer of GMD. In it he stated that Wildwood had no concern about the GMD production schedule for its machines ("there was never any request to adjust your production schedule"); he stated that what was of concern, however, was GMD providing Wildwood with an accounting ("reconciliation") of its use of the first $180,339.60 payment funds ("[t]he only request that has been made of GMD by Wildwood Industries was that GMD provide Wildwood Industries with a reconciliation of the expenditure of the funds that have been paid to GMD").

39. On June 30, 2006, Scott Vollmer of GMD sent an e-mail message to Dominic Propersi of Wildwood Industries offering that GMD "Will do anything to help out."

40. On July 10, 2006, Scott Vollmer of GMD sent an e-mail message to Dominic Propersi, with a copy to John Anderson, both of Wildwood Industries, stating, in part:

> In good faith and according to our fabrication schedule, GMD is proceeding forward with your machines . . . Please see the enclosed photos. You will see a lot of raw round steel stock that is all ready at GMD according to schedule and the scoring shaft for your pleater already finished and coated with cosmolene oil so it can be set aside and when the machine builder is ready for it – it is there ready to go. Motors, gearboxes, pneumatics and electric components are now ordered also – to follow the fabrication schedule I have explained to you. Dominic – it is more than time for Wildwood to make their

second progress payment.

Several photos were attached depicting raw steel stock, a scoring shaft, and materials for a rotary score pleater. Propersi responded by e-mail message the same day to Vollmer stating "Hey! Whatever works." However, unknown to GMD, a few days earlier on July 6, 2006 Wildwood sought machinery fabrication quotes for many of the same machines from a different vendor (Filtration Technology Systems, Inc., a competitor of GMD in the industry).

41. On July 12, 2006, Wildwood Industries' attorney, J. Reed Roesler, sent an e-mail message to Scott Vollmer of GMD citing insecurity and demanding "adequate assurance of due performance" within ten days (by July 22, 2006). He did not express any concern about GMD's production schedule or delivery times.

42. The next day on July 13, 2006, Scott Vollmer of GMD responded by e-mail letter to Wildwood Industries' attorney, J. Reed Roesler, as follows:

> In response to your request of progress GMD is making on machines ordered by Wildwood Industries P.O. #W2168, here listed are items and raw materials ordered, and in house work completed according to GMD production schedule timeline that we use on Wildwood machines, as well as all our customer machines.
>
> - Design work complete and prints documented. Individual sets of prints done for machine shop component work and machinery builders [sic] work
> - Steel Shaft Round Stock ordered and arrived for the pleater scoring shafts, and belt accumulator shafts
> - Scoring shafts completed in OD grind, scoring paddle cuts, end journals ground to fit bearings. Sprayed with cosmolene oil and staged for machine builder to fit
> - Square steel stock ordered and arrived, cut into 24 sections, machine grooved for bearing frame upright assemblies
> - Belt shaft bearings ordered and arrived. Machine shop now cut/grind to fit bearing frame uprights
> - Accumulator belts ordered and arrived

15

- Electronic brake control ordered and arrived
- Pneumatic media roll shaft, and air fill gun ordered
- Electric motor and speed reducer ordered
- Pneumatics ordered: valves, gauges, cylinders
- Infrared Heat Panels ordered
- Conveyor roller, speed control cables and universal joint couplings ordered
- 2" x 2" and 2" x 4" structural steel tubing ordered and arrived, frame structure welded together and complete.

43. The next day on July 14, 2006, Scott Vollmer of GMD sent another e-mail letter to Wildwood Industries' attorney, J. Reed Roesler, dated July 13, 2006, stating that adjusting GMD's production schedule to earlier fabricate Wildwood's first machine, alone, should be adequate assurance of performance in addition to the other adequate assurances of performance in Vollmer's letter of the day before (see paragraph 43 immediately above listing parts and materials ordered and progress made). In turn, Vollmer requested that Wildwood provide to GMD adequate assurance of performance and pay the second $180,339.60 payment, by that time 26 days overdue.

44. Later the same day, July 14, 2006, Wildwood Industries' attorney, J. Reed Roesler, sent an e-mail message to Scott Vollmer of GMD declaring that GMD did not provide adequate assurance of performance (even though only two days earlier attorney Roesler had given GMD ten days until July 22, 2006, within which to provide the assurance), declaring GMD to be in contractual default by repudiation, faulting GMD for not having provided an accounting of the first $180,339.60 payment funds, and demanding a refund of those funds within 10 days (by July 24, 2006).

45. On July 17, 2006, Scott Vollmer of GMD sent an e-mail message to Gary Wilder of Wildwood Industries, sending a copy to Dominic Propersi and attorney J. Reed Roesler, with four photos and descriptions of work in progress on Wildwood's order.

46. Also on July 17, 2006, Scott Vollmer of GMD sent another e-mail message to Gary Wilder of Wildwood Industries, sending a copy to Dominic Propersi and John Anderson, with six more photos and descriptions of work in

progress on Wildwood's order.

47. On the same day, July 17, 2006, Wildwood Industries' attorney, J. Reed Roesler, sent an e-mail message to Scott Vollmer of GMD stating:

> Mr. Vollmer: I cannot make this any more clear. On 7/14/06, Wildwood declared GMD in default of its contract and demanded the return of its initial payment by this coming Monday, 7/24/06. Despite this declaration and demand, GMD appears to be proceeding with work in the absence of a contract. If Wildwood's initial payment is not returned, we will file suit to get it.

48. Sometime after July 17, 2006:

(A)  GMD ceased further work on the Wildwood Industries order at a point in time when fabrication of none of the machines had been completed,

(B)  Wildwood Industries did not at any time pay the second $180,339.60 payment to GMD,

(C)  GMD did not refund the first $180,339.60 payment to Wildwood Industries,

(D)  On or before August 4, 2006, Wildwood Industries sought price quotes for the purchase of similar machinery from another vendor (and received the price quotes on August 4, 2006),

(E)  On September 1, 2006, this lawsuit was filed in which each party alleges the other to have repudiated and defaulted on the contract, and

(F)  On October 17, 2006, Wildwood Industries ordered similar machines to be built by another vendor.

49.  In its Complaint Wildwood Industries seeks a refund from GMD of the $180,339.60 first payment together with prejudgment interest; in its Counterclaim GMD seeks an award against Wildwood Industries of its lost profits together with prejudgment interest.

## CONCLUSIONS OF LAW

50.  Federal court jurisdiction in this case is based on diversity of citizenship.  Genuine Machine Design and Wildwood Industries, both corporate entities, are citizens of different states.  In diversity of citizenship cases, the federal court shall apply the substantive (non-procedural) law of the state in which it sits. 28 U.S.C. §1652; *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 78 (1938). In this case, the substantive law of Indiana applies.

51.  There is no dispute between the parties that a legally valid written contract was formed and entered between them for the construction (fabrication) of certain production machinery by GMD and sale of it to Wildwood Industries in exchange for Wildwood paying the total purchase price of $601,132.20.  A valid written contract need not be in a single self-contained document; it may consist of multiple documents so long as the necessary elements for contract formation exist. *Noble Roman's, Inc. v. Ward*, 760 N.E.2d 1132, 1138 (Ind. Ct. App. 2002); *Johnson v. Sprague*, 614 N.E.2d 585, 590 (Ind. Ct. App. 1993); *17 C.J.S. Contracts* §671.  The written contract in this case consists of:

(A)    GMD's April 4, 2006 Machinery Quotation,

(B)    Wildwood Industries' April 11, 2006 Purchase Order,

(C)    GMD's April 11, 2006 Invoice.

52.  The contract was for the sale of goods, so Indiana's version of the Uniform Commercial Code (U.C.C.) applies.  Ind. Code 26-1-1-101 *et seq.*

53.  Both GMD and Wildwood Industries were "merchants" for purposes of the Indiana U.C.C.  Ind. Code 26-1-2-104.

54. A valid contract for the sale of goods may exist even though the time of delivery is omitted. The official comment to U.C.C. §2-201 provides: "The only term which must appear is the quantity term . . . the . . . time . . .of . . . delivery . . . may . . . be omitted." *See also Pepsi-Cola Co. v. Steak 'N Shake, Inc.*, 981 F. Supp. 1149, 1157 (S.D. Ind. 1997).

55. No express or implied term of the contract in this case, nor any legal authority, required that GMD, as a seller, hold buyer Wildwood Industries' deposit or any other contract payment in trust, or apply the funds in any particular way, or provide to Wildwood an accounting or "reconciliation" of its use or application of any of the funds.

56. Ind. Code 26-1-2-609 provides that a party feeling insecure about the other party's contract performance may seek assurance of performance:

> (1)    A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

> (2)    Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.

> . . . .

> (4)    After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty (30) days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.

57. The standard to be applied when Ind. Code 26-1-2-609 is invoked and a written demand of adequate assurance of due performance is made "is one of reasonable insecurity, not absolute certainty." *Clem Perrin Marine Towing, Inc. v.*

*Panama Canal Co.*, 730 F.2d 186, 191 (5th Cir. 1984). The official U.C.C. Comment 3 to Ind. Code 26-1-2-609 provides that "a ground for insecurity need not arise from or be directly related to the contract. . ." A buyer's demand of adequate assurance of due performance need not be based on a term of the contract; the buyer is then entitled to something that the contract may not otherwise require the seller to give. *Brisbin v. Superior Valve Co.*, 398 F.3d 279, 287-8 (3rd Cir. 2005).

58. The insecurity and adequate assurance provisions of Ind. Code 26-1-2-609 do not require or suggest what form the adequate assurance should take other than that the form be commercially reasonable.

59. Ind. Code 26-1-2-610 provides for remedies when another party breaches a sales contract:

> When either party repudiates the contract with respect to a performance not yet due, the loss of which will substantially impair the value of the contract to the other, the aggrieved party may:
>
> (a) for a commercially reasonable time await performance by the repudiating party; or
>
> (b) resort to any remedy for breach . . . and
>
> (c) in either case suspend his own performance . . .

60. Ind. Code 26-1-2-708 provides for certain remedies when another party repudiates a sales contract:

> (1) Subject to subsection (2) . . . the measure of damages for nonacceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in IC 26-1-2-710, but less expenses saved in consequence of the buyer's breach.

(2) If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done, then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in IC 26-1-2-710, due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

61.  Ind. Code 26-1-2-718 provides that a liquidated damages amount may be the method by which the remedy of damages is measured when another party breaches a sales contract:

> (1) Damages for breach by either party may be liquidated in the agreement, but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy.  A term fixing unreasonably large liquidated damages is void as a penalty.

62.  Case law places the burden of proving reasonableness of a liquidated damages amount on the party seeking to enforce the liquidated damages provision. ". . .[I]n order to show that the sum stipulated in the agreement as liquidated damages is not 'grossly disproportionate' to the loss, the party seeking to enforce the liquidated damages provision must demonstrate some proportionality between the loss and the sum established as liquidated damages." *Harbours Condominium Ass'n, Inc. v. Hudson*, 852 N.E.2d 985, 993 (Ind. Ct. App. 2006)(citing *Gershin v. Demming*, 685 N.E.2d 1125, 1128 (Ind. Ct. App. 1997).

63.  Ind. Code 26-1-2-202 prohibits use of prior or contemporaneous parol evidence to contradict the terms of a sales contract but does allow the contract to be explained or supplemented by course of dealing, usage of trade, course of performance, or sometimes consistent additional terms.

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect

to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:

(a) by course of dealing or usage of trade (IC 26-1-1-205) or by course of performance (IC 26-1-2-205); and

(b) by evidence of consistent additional terms, unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

64. Ind. Code 26-1-1-205 defines "course of dealing" and "usage of trade":[5]

(1) A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

(2) A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. If it is established that such a usage is embodied in a written trade code or similar writing the interpretation of the writing is for the court.

(3) A course of dealing between parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement.

(4) The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade.

---

[5]The statute set forth here is the version in effect in 2006. Ind. Code 26-1-1-205 was since modified in 2007.

(5) An applicable usage of trade in the place where any part of performance is to occur shall be used in interpreting the agreement as to that part of the performace.

(6) Evidence of a relevant usage of trade offered by one party is not admissible unless and until he has given the other party such notice as the court finds sufficient to prevent unfair surprise to the latter.

65. Ind. Code 26-1-2-208 defines "course of performance":[6]

(1) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

(2) The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade (IC 26-1-1-205).

(3) Subject to the provisions of IC 26-1-2-209 on modification and waiver, such course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance.

66. Federal Rule of Civil Procedure 15(b)(2), second and third sentences, provides: "A party may move – at any time, even after judgment – to amend the

---

[6] The statute set forth here is the version in effect in 2006. Ind. Code 26-1-2-208 was repealed in 2007 and re-written into the 2007 version of Ind. Code 26-1-1-205.

pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial on that issue."

67. Ind. Code 34-51-4-7 provides for an award of prejudgment interest as part of a judgment.

## ANALYSIS

### 1.     INTERPRETATION OF TERMS OF DELIVERY DATES

68. By April 11, 2006, Wildwood Industries and Genuine Machine Design were parties to a single valid legal contract for the sale of goods consisting of three documents:

(A)     GMD's April 4, 2006 price quotations,

(B)     Wildwood's April 11, 2006 purchase order, and

(C)     GMD's April 11, 2006 invoice.

Since delivery dates were addressed in the contract documents, any previous discussions or representations between the parties as to delivery dates for the completed machines were superseded by the delivery terms in their written contract. Ind. Code 26-1-2-202.

69. The delivery dates set forth in the written contract were variously stated as:

(A)     "Delivery time: 4 - 5 months ARO (after receipt of order) with current GMD production schedules"
(April 4 GMD price quote for some of the machines),

(B)     "Lead time: 4 - 5 months"
(April 4 GMD price quote for one of the machines),

(C)   "Lead time: 4 - 5 months with current GMD production schedules"
      (April 4 GMD price quote for some of the machines),

(D)   "Lead time 4 - 5 months ARO"
      (April 11 GMD Invoice for all of the machines),

(E)   "Delivery of these machines will be a staggered schedule agreed to
      between Wildwood and GMD"
      (April 11 GMD Invoice for all of the machines).

70.  Wildwood Industries' April 11, 2006 Purchase Order form had a place for Wildwood to enter a "Required Date" for delivery of the machines but Wildwood declined to insert any delivery dates, leaving that part of the form blank.

71.  When read together, at face value, the various terms of the contract relating to delivery dates could mean:

(A)   all of the machines will be finished by GMD and delivered within
      4 - 5 months of April 11, 2006,

(B)   GMD will have 4 - 5 months "lead time" from April 11, 2006,
      within which to begin fabricating the machines due to its then
      existing production schedule, or

(C)   unspecified delivery dates will be agreed to by the parties at a future
      time and will be on a staggered schedule.

72.  There was no evidence presented to the Court as to course of dealing, usage of trade, or course of performance between the parties; therefore, clarification of the ambiguities regarding delivery dates cannot be obtained in any of these ways.

73.  Both the April 4, 2006 GMD Machinery Quotation and the April 11, 2006 GMD Invoice state that they are "not subject to verbal changes or other agreements unless approved in writing by the buyer and GMD." The April 11, 2006 Purchase Order of Wildwood Industries is silent as to subsequent possible changes of contract terms.  Therefore, the delivery terms in the April 11, 2006

GMD Invoice control. Those delivery terms are: "Delivery of these machines will be a staggered schedule agreed to between Wildwood and GMD" and "Lead time 4 - 5 months ARO."

74. In the October 15, 2007 Opinion And Order of this Court ruling on cross motions for summary judgment, the Court found that these delivery terms were ambiguous because they can be reasonably interpreted in more than one way. At that time, and in that context, the Court found that interpretation of these contract terms was not a question of law for determination by the Court but, rather, was a question of fact. Later, the Bench Trial was held and this Court served as the trier of fact.

75. As a determination of fact after hearing the trial evidence, the Court construes the delivery terms to mean that GMD needed and was allowed 4 - 5 months from April 11, 2006, within which to complete the first of the machines and have it ready for delivery, and that Wildwood Industries and GMD would sometime in the future, after April 11, 2006, agree to a staggered delivery schedule for the other machines.

76. That is the most commercially reasonable and practical interpretation of the delivery terms. To interpret the delivery terms in the way Wildwood Industries wants would mean that GMD, in its small facility, with its small number of employees, and with other production work already scheduled ahead of Wildwood's order but not yet completed, would order materials and component parts, wait for their delivery, determine machine specifications, then build and deliver 31 machines, several of which were custom machines that first needed to be designed by GMD, all within 13 - 17 weeks (4 - 5 months).


## 2. WILDWOOD INDUSTRIES' LACK OF GROUNDS FOR INSECURITY


77. Pursuant to Ind. Code 26-1-2-609, a contracting party must have "reasonable grounds for insecurity" before it can demand adequate assurance of due performance.

78.  Wildwood Industries' written demand for GMD to provide adequate assurance of due performance was first made June 15, 2006 (in Dominic Propersi's e-mail message to Terry Forsburg of GCI Capital with a copy sent to Scott Vollmer of GMD).  It was in the form of a demand for an accounting ("reconciliation") of GMD's use of the first $180,339.60 payment.  With completion and delivery of the first of the machines not being due until, at the earliest, August 11, 2006 (four months from April 11, 2006), Wildwood did not have reasonable grounds for feeling insecure about GMD duly performing its contract obligations.  Wildwood's demand was unjustified under the circumstances.

79.  Because Wildwood Industries did not have "reasonable grounds for insecurity," GMD was not obligated by law to provide Wildwood with adequate assurance of due performance.


3.     GMD'S ADEQUATE ASSURANCE OF DUE
PERFORMANCE


80.  Although not legally obligated to do so (assuming for the sake of argument that Wildwood Industries did have reasonable grounds for insecurity and its demand for assurance was justified), GMD did nevertheless provide to Wildwood adequate assurance of its due performance:

(A)     the next day, on June 16, 2006, Scott Vollmer of GMD sent an e-mail message to Dominic Propersi of Wildwood stating that GMD was "able to move our schedule around to get your first 1" rotary pleater to you a bit quicker,"

(B)     also on June 16, 2006, Scott Vollmer of GMD sent another e-mail message to Dominic Propersi of Wildwood stating "This is a flowing process" and "When we are 'starting' your machines I will be in touch routinely with written reports and photo updates",

(C)     on June 20, 2006 Scott Vollmer of GMD sent an e-mail message to Dominic Propersi of Wildwood stating "Will be meeting with Phil today about pinch frames and get some info to you as soon as we

can,"

(D)     on July 10, 2006, Scott Vollmer of GMD sent an e-mail message to
        Dominic Propersi of Wildwood, sending a copy to John Anderson
        of Wildwood, stating that production work on Wildwood's order
        had begun and he included five photos,

(E)     on July 13, 2006, Scott Vollmer of GMD sent an e-mail letter to
        Wildwood's attorney, J. Reed Roesler, and listed, in detail, items and
        raw materials ordered by GMD for Wildwood's machines and
        in-house work completed to date,

(F)     on July 17, 2006, Scott Vollmer of GMD sent an e-mail message to
        Gary Wilder and Dominic Propersi, both of Wildwood, and to
        Wildwood's attorney, J. Reed Roesler, stating that GMD was making
        progress on the first pleating machine, it was beginning work on the
        second pleater, and he enclosed four photos,

(G)     on July 21, 2006, Scott Vollmer of GMD sent an e-mail message to
        Gary Wilder of Wildwood, sending a copy to Dominic Propersi and
        John Anderson, both of Wildwood, listing additional work
        recently completed by GMD on Wildwood's order, and he
        included six photos.


4.      WILDWOOD INDUSTRIES BREACHED THE CONTRACT


81.  In their April 11, 2006 Purchase Order Wildwood Industries agreed to
pay to GMD 30% of the total contract price of $601,132.00 (30% being
$180,339.60) within 60 days from April 11, 2006.  Sixty days from April 11, 2006,
was June 10, 2006.  However, in GMD's April 11, 2006 responsive Invoice, GMD
mistakenly stated that that payment was due June 18, 2006, so the Court
determines that the due date for that second payment was June 18, 2006.


82.  On June 18, 2006, delivery of the completed machines by GMD to

Wildwood Industries was not yet due (delivery of the first machine was, according to the contract, due 4 - 5 months after April 11, 2006, with delivery dates on a staggered schedule for the other machines not yet determined). As of June 18, 2006, Wildwood lacked reasonable or justified grounds for insecurity and for requesting adequate assurance of due performance.

83. On June 18, 2006, Wildwood Industries' second $180,339.60 payment to GMD was due. Wildwood failed to pay the payment, intentionally declining to do so. At that point, and by that failure, Wildwood breached the contract and repudiated the future obligations of the parties on the contract.

84. When Wildwood Industries breached and repudiated the contract on June 18, 2006, then pursuant to Ind. Code 26-1-2-610(c), GMD had the right to suspend its own performance (suspend further work on fabricating the machines) otherwise required by the contract.

### 5.   MEASURE OF DAMAGES

85. Under Ind. Code 26-1-2-708(1), one way to measure GMD's damages for Wildwood Industries' breach of contract is the difference between the market price at the time and place for tender and the unpaid contract price plus incidental damages less expenses saved as a result of the breach. Quite a few of the machines ordered by Wildwood were custom machines for which there was no regular market; hence, no market price. Some were standard non-custom machines for which little, if any, evidence was presented at trial as to market price. As of June 18, 2006, none of the machines were even in the actual fabrication stage, although by then a production schedule had been made by GMD to accomodate Wildwood's request for a 1" rotary score pleater as soon as possible, the design work for that machine had been completed, detailed machine specifications had been discussed with Wildwood, and GMD was waiting to receive more information from Wildwood. Therefore, the Court is unable to calculate GMD's damages by this measure.

86. Under Ind. Code 26-1-2-708(2), another way to measure GMD's

damages for Wildwood Industries' breach of contract is to calculate its lost profits. GMD concedes in its post-trial submissions that it has failed to prove an amount of lost profits to a reasonable degree of certainty. Therefore, the Court is unable to calculate GMD's damages by this measure.

87. Under Ind. Code 26-1-2-718, another way to measure GMD's damages is the amount of liquidated damages contained in the parties' agreement if reasonable in amount. In neither its Counterclaim nor its portion of the Pre-Trial Order did GMD request that the Court award liquidated damages.

88. The trial evidence establishes that the contract of the parties provides (in GMD's April 11, 2006 Invoice) that if: "Order cancelled by customer – GMD retains deposit amount." Their contract agrees that Wildwood Industries' first payment was for $180,339.60, to be paid immediately upon consummation of the contract (April 11, 2006). It was in fact paid by Wildwood six days late on April 17, 2006. The Court finds that Wildwood's April 17, 2006 first payment of $180,339.60 was a deposit amount and the contract language "Order cancelled by customer – GMD retains deposit amount" is a liquidated damages agreement by the parties that applies in these circumstances.

89. The $180,339.60 amount of liquidated damages agreed to by the parties is a reasonable amount of damages, given the circumstances, in light of the anticipated or actual harm caused by the breach (GMD lost its largest single order of product ever, a contract worth the gross amount of $601,132.00, and it had prevailed upon another customer to defer that customer's time slot in GMD's production schedule so that Wildwood Industries' first machine could be built sooner), the difficulties of proof of loss (other ways of attempting to measure GMD's damages, such as lost profits, cannot be or have not been proven), and it is nonfeasible for GMD to otherwise reasonably obtain an adequate remedy.

90. Although GMD did not request an award of liquidated damages in its pleadings, or otherwise, prior to trial, evidence of the parties' liquidated damages clause in their agreement was admitted into evidence at trial without objection and by joint stipulation (joint stipulated trial exhibit # 26). In its post-trial briefing, GMD argues that it should receive a liquidated damages award (Defendant's Proposed Findings Of Fact And Conclusions Of Law, docket # 98 in the Court record, paragraphs 55 - 58). The Court construes that written argument to be a

motion by GMD to amend its Counterclaim to conform it to the evidence and to raise an unpleaded issue pursuant to FRCP 15(b)(2), second and third sentences. Wildwood Industries has had an opportunity to respond to this issue and has indeed done so (Plaintiff's Proposed Findings Of Fact And Conclusions Of Law, docket #99 in the Court record, pp. 37 - 39).

91.  The Court finds that the amount of GMD's damages for Wildwood Industries' breach of the contract by its failure to pay the second payment (thereby repudiating the contract and cancelling the contract) is $180,339.60.  GMD's post-trial, pre-judgment motion (construed motion) for an award of liquidated damages in the amount of $180,339.60 is granted.

92.  The Court finds that Wildwood Industries paid this damages award in full in the form of its $180,339.60 deposit (first payment) paid to GMD April 17, 2006.  GMD is not ordered to refund any of that payment to Wildwood.

93.  In its Counterclaim GMD has also requested that this Court award prejudgment interest as a part of the judgment.  However, prejudgment interest is not applicable here because, in fact, GMD received the $180,339.60 amount of its judgment in full (the liquidated damages amount) prior to the date GMD filed its Counterclaim and even prior to the date Wildwood Industries breached, repudiated, and cancelled the contract.

94.  In its Counterclaim, GMD has also requested that the Court order Wildwood Industries to pay court costs in this case.  28 U.S.C. §1920 allows for the taxation of court costs.

SUMMARY OF ORDER

95.  In summary:

(A)    Wildwood Industries and GMD entered a contract for the sale of goods, as merchants,

(B)    GMD had 4 - 5 months from April 11, 2006, within which to

complete production of the first of the machines, and the parties would sometime in the future agree to a staggered delivery schedule for the other machines,

(C)     Wildwood Industries did not have reasonable grounds for insecurity with respect to GMD's performance under the contract, so Wildwood had no right to demand adequate assurance of due performance by GMD,

(D)     Wildwood Industries breached, repudiated, and cancelled the contract by failing to pay its second $180,339.60 payment due June 18, 2006,

(E)     GMD did not breach the terms of the sale contract and stood ready to timely perform,

(F)     the measure of GMD's damages is the liquidated damages amount of $180,339.60,

(G)     Wildwood Industries previously paid that $180,339.60 to GMD.


JUDGMENT


96.  Accordingly, Plaintiff Wildwood Industries, Inc. shall take nothing by its Complaint against Genuine Machine Design, Inc.  Genuine Machine Design, Inc. prevails on its Counterclaim against Wildwood Industries, Inc.  The Court hereby **ENTERS JUDGMENT** in favor of Genuine Machine Design, Inc. against Wildwood Industries, Inc. in the amount of $180,339.60 and the Court finds that Wildwood Industries, Inc. has paid the amount of this judgment in full.  There is no prejudgment interest nor post-judgment interest ordered to be paid.  Wildwood Industries, Inc. shall pay the costs in this case, upon GMD filing with the Court a bill of costs and upon allowance of same by the Court.


So **ORDERED** this 20th day of November, 2008.

s/ Paul R. Cherry
Paul R. Cherry
Magistrate Judge
United States District Court
Northern District of Indiana


cc:    David G. Lubben, Attorney for Plaintiff Wildwood Industries, Inc.

       Stuart P. Boehning and Kyle B. Mandeville, Attorneys for Defendant
       Genuine Machine Design, Inc.